UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECO ELECTRICAL SYSTEMS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> RELIAGUARD, INC.; GREENJACKET, INC.; and MAYDWELL & HARTZELL, LLC. <br><br> Defendants. | No. C 20-00444 WHA <br><br> **ORDER RE MOTIONS FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

In this unfair business practices suit, defendants move for summary judgment. To the extent stated below, the motions are **GRANTED IN PART** and **DENIED IN PART**.

**STATEMENT**

This case arises from a fierce fight between two competitors to supply Pacific Gas & Electric Company with specialized guards that protect birds and other animals from electrocution.

In 2000, Michael Lynch founded plaintiff Eco Electrical Systems, which designs, manufactures, and sells "avian protection devices" to utility companies. In about 2003, PG&E asked Eco to design a "cutout cover" to prevent animals from coming into contact with "cutouts," a type of electrical device that rests atop utility poles. In response, Eco developed

the ECC-3 cutout cover, which it sold, unchanged, to PG&E until 2019. The ECC-3, which is designed for cutouts made out of porcelain, is Eco's most successful product and is also sold to other utility companies. PG&E also purchases, in much smaller quantities, the ECC-10 cutout cover, which is made from the same material but is designed for particularly large porcelain cutouts. Additionally, Eco sells to other utilities — but not PG&E — the ECC-2 cutout cover, which is designed for smaller cutouts made from polymer (Lynch Decl. ¶ 3–6; Cart Decl. Exh. 5 at 78–79).

In late 2013, a PG&E employee told Lynch that PG&E was concerned about the fire risk associated with Eco's ECC-3 and ECC-10 cutout covers. Specifically, PG&E feared that, in the event electrical equipment on a utility pole caught on fire, Eco's cutout covers could cause a wildfire by melting and "dripping" hot material to the ground below. In response to PG&E's concerns, Eco developed what it contends is flame-resistant material and told PG&E it had the ability to sell cutout covers composed of this new material. In early 2014, Lynch met with a "large group" of PG&E employees to share third-party test reports illustrating the new material's efficacy and to discuss the possibility of altering the ECC-3 to accommodate PG&E's concerns. PG&E, however, never requested a change or otherwise followed up on the meeting, so Eco continued to sell it the ECC-3 product without modifications (Lynch Decl. ¶¶ 14–15; Noll Exhs. 17, 35; Cart Exh. 15).

Meanwhile, PG&E was discussing the fire issue with other potential vendors. In 2013, a PG&E employee, Rudy Movafagh, informed Cantega Technologies, a company involved in electrical distribution equipment, about PG&E's fire concerns. Cantega recognized an opportunity to establish a business relationship with PG&E and in 2015 began to develop a cutout cover to compete with Eco's products. Cantega coordinated these development efforts through a subsidiary that eventually rebranded itself as defendant Reliaguard, Inc. (Noll M&H Exh. 5; Jacobsen Decl. ¶¶ 2–4).[1]

---

[1] Defendant Greenjacket, Inc., was also a subsidiary of Cantega and was "essentially a sister company" to Reliaguard (Br. 5).

Eco contends that Reliaguard engaged in a "targeted campaign" to undermine Eco's reputation and business relationship with PG&E (Opp. 7; Noll Exh. 8–9). Eco asserts this campaign had three central elements.

*First*, Reliaguard sought to establish personal relationships with key decisionmakers at PG&E, including by "wining and dining" them. These efforts were driven, according to Eco, by Maydwell & Hartzell, a consulting firm in the electrical equipment industry that had established relationships with PG&E employees and had become familiar with PG&E's internal processes for approving outside vendor products. For example, Bob Frase, one of M&H's managers, had a longstanding personal relationship with Movafagh, the PG&E employee spearheading PG&E's effort to replace the ECC-3 with a fire-resistant cutout cover. Reliaguard and M&H (together, "defendants") thought they could capitalize on this relationship to win business from PG&E. Movafagh asserted his Fifth Amendment rights in this litigation and refused to be deposed, a circumstance that was never previously brought to the Court's attention (Opp. 11; Noll M&H Exhs. 2, 5; Bowles M&H Decl. ¶¶ 24–25).

Defendants also established a relationship with Dan Hernandez, another PG&E employee involved in PG&E's cutout cover approval process. This effort, which began in 2016, included the son of Bob Frase, named Gavin Frase, and Mark Jacobsen, a Reliaguard employee, inviting Hernandez to attend baseball games in private suites, taking him out for drinks and a dinner, and coordinating a round of golf and a professional golf lesson. Gavin Frase and Jacobsen also regularly exchanged text messages with Hernandez during PG&E's approval deliberations. And, at one point in 2017, Hernandez sold used car parts to Jacobsen for $600 (Noll Exhs. 14, 18, 46; Noll M&H Exh. 26; Cart. Supp. Exh. 65 at 124–31).

Eco contends these relationships were "improper" and resulted in Reliaguard receiving favorable treatment from PG&E. In 2015, for example, Hernandez began working directly with Reliaguard to design a new cutout cover. This included Hernandez providing Reliaguard with photographs and measurements of Eco's cutout covers. Bob Frase (the dad) also used his relationships at PG&E to procure samples of Eco's products and Eco pricing information,

which he then supplied to Reliaguard (Opp. 11–12; Noll Exhs. 8–9, 11, 13–15, 26, 30; Noll M&H Exhs. 18, 21, 23, 34–35, 41; Lynch Decl. ¶ 10).

*Second*, Reliaguard created and shared with PG&E defamatory videos that allegedly misrepresented Eco's products. Two videos have center stage. In the "YouTube Video," Reliaguard's founder, Marty Niles, sets a Reliaguard cutout cover and Eco cutout cover next to each other on two energized cutouts and tests the covers with a probe to assess whether they present a risk of electrocution. Niles touches the Eco cover with the probe and says: "That's a fail. . . . Obviously, a fail with the exposed parts." Then, in the "Crow Video," Niles similarly sets a Reliaguard cover and an Eco ECC-10 cover next to each other, except he holds a pole to which is attached, for illustrative effect, a fake crow with an energized probe in place of a beak. Niles again says "that's a fail" after the touching the Eco cover with the probe (Noll. Exh. 15; M&H Exhs. 14–15).

Eco contends these videos were defamatory because they both depict an ECC-10 cover, which is designed for large porcelain cutouts, placed on a smaller polymer cutout. The cutout covers in the videos are also not installed properly. The result, according to Eco, is an inaccurate depiction of how loosely Eco's cutout covers fit over PG&E's cutouts. Because the purpose of the covers is to prevent animals from coming into contact with energized cutouts, Eco asserts that portraying Eco's cutout covers as having a loose fit falsely suggested to PG&E that Eco's products were not effective (Br. 14; Lynch Decl. ¶¶ 30–31).

Defendants shared the videos with PG&E at least four times. Reliaguard and M&H representatives played the Crow Video to PG&E employees at a meeting in March 2018. The videos were published on Reliaguard's YouTube channel, and Gavin Frase sent Movafagh and Hernandez a link to the channel in March 2018. In September 2018, Niles emailed the Crow Video directly to Pat Hogan, PG&E's Senior Vice President. And, in October 2018, Niles emailed one of the videos to Movafagh (Noll. M&H Exhs. 27, 29, 31; Noll Exhs. 8, 67, 75).

*Third*, Eco contends that Reliaguard provided PG&E a doctored test report falsely suggesting that Eco's ECC-2 cutout cover was not flame resistant. PG&E required any new cutout cover it approved for purchase to comply with an industry standard called UL 94.

4

Specifically, the cutout cover had to receive a "V-0 rating" under the UL 94 standard, which essentially meant the cover must withstand high heat for a certain length of time without catching on fire, melting, or dripping. The test report that Reliaguard gave to PG&E stated that the tested sample, which Reliaguard told PG&E was Eco's "ECC-2 Cutout Cover," failed to achieve a V-0 rating (Cart Exhs. 64; 22 at 25).[2]

Eco disputes the reliability of the test and contends that Reliaguard presented the results to PG&E in a misleading way. In September 2018, a Reliaguard employee sent a piece of Eco's ECC-2 cutout cover to a third-party laboratory to test the flame resiliency of the piece — called a "pin" — under the UL 94 standard. The laboratory then sent the results of the test to Reliaguard on a document that included the laboratory's letterhead. After receiving the results, Reliaguard employees modified the document to change the letterhead and omit language clarifying that the tested sample had been previously burned and that the tested sample was merely a pin as opposed to the entire cover.[3]

Niles sent the altered version of the test report to Movafagh on October 1, 2018. The next day, Movafagh sent an email attaching the test report to the team at PG&E conducting the approval process for the new cutout cover. In late October and early November 2018, PG&E began the process of approving Reliaguard's cutout cover for purchase. In February 2019, PG&E announced it had placed Eco's ECC-3 cutout cover on its "Do Not Purchase" list and had approved Reliaguard's cutout cover for purchase. The ECC-3 has been Eco's best seller but has gone unsold to PG&E since 2019 (Noll. Exhs. 75, 86, 89, 98; Lynch Decl. ¶ 29).

---

[2] Eco additionally contends, in an attorney declaration, that Reliaguard misled PG&E by suggesting on its website that V-0 was the "highest" rating, and that "this is one of the misrepresentations by Reliaguard that Eco alleges in its complaint" (Bowles Supp. Decl. ¶¶ 12–13). This assertion, however, is not accompanied by any citation to the record and is not discussed at all in Eco's opposition brief. Moreover, Eco's amended complaint is silent on this issue (*see* Dkt. No. 14). Thus, this order will not address this contention.

[3] Eco also contends that the purported third-party test never happened, and Niles actually sent a document to PG&E that transposed language from a 2017 test of *Reliaguard's* cutout cover (Opp. 19). In support of this theory, Eco provided a copy of the 2017 test report (Noll Exh. 76). However, the 2017 test report and the 2018 test report are not identical and do not bear enough similarities to support any inference that the latter was transposed from the former (*see* Cart Exh. 64). Therefore, this evidence lacks foundation for the purpose for which it is offered.

5

Eco contends that PG&E would have chosen to replace the ECC-3 cutout cover with the ECC-2 cover if not for Reliaguard's efforts to undermine PG&E's confidence in Eco's products. Reliaguard replies that PG&E's decision was driven by concerns that had nothing to do with the videos or test report. Other than during Lynch's 2014 meeting with PG&E, Eco never provided PG&E with third-party test reports showing that Eco's product was flame resilient. Multiple PG&E employees testified that, when they were assessing Eco's products in 2018, they felt the 2014 test reports were "outdated" (Cart. Exh. 4 at 152–54). PG&E had also received reports suggesting that Eco's products "electrically tracked," which presented a fire risk. In 2017, for example, a PG&E employee reported that an ECC-3 cover "track[ed] causing fire and burned up a cutout. . . . this hashappened multiple times ;tracking ;don't use bird guard" (Cart Exh. 51 (all errors in original)). According to PG&E employees, part of the issue was that ECC-3 covers had a "loose fit" over PG&E's cutouts, which, among other problems, allowed squirrels to store acorns inside the cutout cover. PG&E believed that the accumulation of acorns facilitated "tracking" and thus exacerbated the risk of fire (Cart Exh. 9 at 253). In April 2018, a PG&E employee reported that an ECC-3 cover "filled with acorns" had "track[ed]/"melt[ed]" and "dripped melted plastic onto the ground" (Cart Exh. 50). In addition to concerns about the "acorn issue," PG&E employees testified that they chose Reliaguard's product because Eco failed to follow PG&E's formal requirements for product approval and Reliaguard was generally more responsive to PG&E's feedback (Cart Exh. 1 at 135).

Reliaguard additionally produced testimony from several PG&E decisionmakers stating that they did not rely on either the YouTube Video or Crow Video to make their decision to purchase Reliaguard's cutout cover. Hernandez testified that he did not recall seeing the videos and that they "didn't impact me at all" (Cart Exh. 6 at 81–82, 86). Another PG&E employee, Sam Chang, testified that the presentation of the Crow Video at the March 2018 meeting gave him "a good laugh" and that "we did not think that was professional" (Cart Exh. 4 at 102–103). A third PG&E employee, Jon Steffens, testified that he found the Crow Video to be "a little bit absurd" (Cart Exh. 8 at 83–89).

\*           \*           \*

In January 2020, Eco brought claims against defendants for trade libel, intentional interference with prospective economic advantage, false advertising under California Business and Professional Code §§ 17500 *et seq.*, unfair business practices under California Business and Professional Code §§ 17200 *et seq.*, and false advertising in violation of the federal Lanham Act. Defendants now move for summary judgment on all claims. This order follows full briefing and oral argument.

## ANALYSIS

At the summary judgment stage, the record is viewed in the light most favorable to the nonmoving party and "all reasonable inferences that may be drawn from the facts placed before the court must be drawn" in favor of the opposing party. *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065 (9th Cir. 2003) (citations omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). But "bald assertions that genuine issues of material fact exist are insufficient. A factual dispute is genuine only if a reasonable trier of fact could find in favor of the nonmoving party." *Galen v. Cnty of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007) (citations omitted).

1. **LANHAM ACT.**

Section 43(a)(1)(B) of the Lanham Act forbids false descriptions or representations in the advertising and sale of goods and services. *Smith v. Montoro*, 648 F.2d 602, 605 (9th Cir. 1981). A plaintiff alleging a Lanham Act false advertising claim must show:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

7

1  *Southland Sod Farms v. Stover Seed Co. Eyeglasses*, 108 F.3d 1134, 1139 (9th Cir. 1997). A
2  plaintiff may demonstrate falsity by proving a statement facially false, false by necessary
3  implication, or by showing a literally-true statement was likely to mislead consumers. *Ibid.*
4  "When evaluating whether an advertising claim is literally false, the claim must always be
5  analyzed in its full context." *Ibid*.

### A. INTERSTATE COMMERCE.

As detailed above, Eco asserts that two sets of communications, the videos and the modified test report, were false or misleading. Reliaguard replies that the interstate commerce element is not satisfied. Specifically, Reliaguard asserts that Eco "cannot point to any actionable meetings or statements directed to or received outside of California" (Br. 27). At the motion hearing, the parties also argued extensively about whether Eco's products are made or shipped outside California.

These arguments misconstrue the broad scope of the Lanham Act's interstate commerce requirement. The Lanham Act defines the word "commerce" to include "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. "Because Congress may regulate the channels and instrumentalities of interstate commerce, and activities that substantially affect interstate commerce, Lanham Act jurisdiction attaches to use of a false statement in interstate commerce, or intrastate commerce which 'affects' interstate commerce." *Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*, No. C 19-06593 HSG, 2021 WL 5233129, at *3 (N.D. Cal. Nov. 10, 2021) (Judge Haywood S. Gilliam, Jr.) (citing *Thompson Tank & Mfg. Co. v. Thompson*, 693 F.2d 991, 992–93 (9th Cir. 1982)).

Our record shows that the asserted communications were published online and shared in emails. Communications made online generally implicate interstate commerce. *See, e.g., United States v. Sutcliffe*, 505 F.3d 944, 952–53 (9th Cir. 2007) ("[T]he Internet is an instrumentality and channel of interstate commerce.") (internal citation omitted). Thus, even setting aside the parties' dispute about whether the communications "affect" interstate commerce, Eco has provided sufficient evidence to support a finding that the interstate commerce element has been met.

8

### B. THE ALTERED TEST REPORT.

Eco contends that a jury could reasonably find that Reliaguard's alterations of the test report were false or misleading. This order agrees.

Reliaguard counters that Eco should be not allowed to raise any argument related to the test report because Eco's amended complaint only stated allegations related to the YouTube Video (Br. 4). However, Eco stated in its interrogatory responses that one of the factual bases for its claims was that Reliaguard had "provided PG&E with false and doctored test reports purportedly for ECO's products" (Cart Exh. 18). Reliaguard addressed the issue directly in the instant motion and produced a copy of the original test report (Br. 18–19; Cart Decl. 64). The altered report was also discussed in multiple depositions (*see* Jacobsen Depo.; Vandermaar Depo.). Moreover, Reliaguard had an opportunity to respond to Eco's arguments about the test report in its reply brief, further curing any perceived prejudice (Reply Br. 10–11). Reliaguard must litigate the issue on the merits.

Reliaguard's reply brief represented to the Court that Reliaguard merely "took the *verbatim* results of a laboratory test" and put them on a new document with Reliaguard letterhead (Reply Br. 10 (emphasis in original)). This representation was false. In addition to various other alterations, our record plainly shows that Reliaguard modified the original test report to omit a segment explaining that the tested sample "was received with some burning on the ends" (Cart Exh. 64; Noll Exhs. 75–78). This omission was critical because the flammability test could not have produced reliable results if the tested sample had been previously burned and tampered with, or so a reasonable jury could find. Additionally, Reliaguard employees changed language in the original report from "Objective: Evaluate part for FR performance" to "Objective: Evaluate Eco Cutout Cover (ECC-2) for FR performance" (Cart Exh. 64; Noll Exh. 75). Reliaguard's own expert offered testimony suggesting this change could also be misleading:

> The . . . independent test result of the cover. It is not a test of the cover itself. That's correct. The way it's stated here it says "Cover," and the pin is not a cover. It's part of the cover.

(Vandermaar Depo. 206). Based on this evidence, a jury could reasonably find that PG&E was misled to believe it had received test results of a pristine ECC-2 cutout cover when in reality it had received test results of a previously burned pin.

A reasonable jury could also infer that the modified test report caused Eco injury. Our record shows that, one day after Reliaguard shared the modified test report with PG&E, Movafagh emailed the report to other PG&E employees:

> We have been looking at this for the past three years. . . . We need to move forward with the products that we believe work well (equipment covers, etc..,) and have it rolled out for use in 2019 FR program. . . . Please make this a high priority for your team. This means we will need it included in the 11/15 quarterly roll out. . . . *The COs seem to fit better with Eco, which is fine , but let's make sure the product actually does the job (see the testing of Eco by Relaiguard team at High Voltage lab in Canada!)*

(Noll Exh. 72) (emphasis added and errors in original). Two weeks later, PG&E began the process of approving Reliaguard's cutout cover for purchase. This evidence supports a reasonable inference that the modified test report influenced PG&E's decision to purchase the Reliaguard's cover instead of the ECC-2 cover.

### C.   THE VIDEOS.

Eco has also presented a triable issue of fact as to whether the videos constituted false advertising. Our record shows that PG&E was concerned about the loose fit of Eco's cutout covers and that Reliaguard created the videos to emphasize that Eco's covers fit loosely over PG&E's cutouts. It's undisputed that the videos depicted an ECC-10 cutout cover placed on a polymer cutout and that ECC-10 covers are designed for larger porcelain cutouts (*see* Br. 14). Those facts alone would allow a reasonable jury to infer, taking all inferences in Eco's favor, that the videos were literally false or misleading.

Lynch also stated in his declaration that the ECC-10 was not installed properly (Lynch Decl. ¶¶ 30–31). Defendants argue that this statement is inadmissible because it is based on technical or specialized knowledge and Lynch was never qualified as an expert (Reply Br. 5). This is ridiculous. An advisory committee note to Federal Rule 701 explains that:

> [C]ourts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. The amendment does not purport to change this analysis.

Fed. R. Evid. 701, Advisory Committee Note (2000) (citation omitted). Thus, "[w]here, as here, a witness is testifying as to institutional . . . practices based on personal knowledge that the witness has accrued over the course of several years of employment, the witness is providing lay testimony not subject to Rule 702." *Siebert v. Gene Sec. Network, Inc*, 75 F. Supp. 3d 1108, 1114 (N.D. Cal. 2014) (Judge Jon S. Tigar). Lynch knows how his own products work. Thus, Lynch's statement is admissible and further establishes a genuine dispute over whether the videos were false or misleading.

Even so, defendants insist that the videos were not material and caused no injury because PG&E employees testified that the videos did not influence their decision to stop purchasing Eco's cutout covers (Br. 14). We will see if the jury believes this self-serving testimony in light of all the circumstances to the contrary.

True, "actual evidence of *some* injury resulting from the deception is an essential element of the plaintiff's case" and "[s]ummary judgment is thus proper when the plaintiff fails to present *any* evidence of injury resulting from defendants' deception." *VBS Distribution, Inc. v. Nutrivita Laboratories, Inc.*, 811 Fed. Appx. 1005, 1007 (9th Cir. 2020) (quoting *Harper House Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989)) (emphasis added). In *VBS Distribution*, for example, the plaintiff's only evidence of injury was a vague, conclusory declaration asserting that the defendant's advertisement had "diverted sales." *Ibid.* Our court of appeals held that such "sparse" and "thin" evidence was insufficient to survive summary judgment. *Ibid.*

In other decisions, however, our court of appeals has repeatedly suggested that Section 43(a)'s injury requirement is lenient and "express[ed] a distinct preference for those opinions permitting relief based on the totality of the circumstances." *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1410–11 (9th Cir. 1993) (evidence that "at least one wholesale

11

distributor engaged in switching its product is credible proof of the fact of damage"); *see also ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 Fed. Appx. 609, 616 (9th Cir. 2016) (the Lanham Act "permits a jury to infer injury based on evidence of direct competition (which provides a causal link) and a likelihood of consumer deception"). Indeed, for false comparative advertising claims, our courts of appeals "has held that publication of deliberately false comparative claims gives rise to a presumption of actual deception and reliance." *Southland*, 108 F.3d at 1146 (citation omitted). Thus, as our court of appeals has explained:

> The expenditure by a competitor of substantial funds in an effort to deceive consumers and influence their purchasing decisions justifies the existence of a presumption that consumers are, in fact, being deceived. He who has attempted to deceive should not complain when required to bear the burden of rebutting a presumption that he succeeded.

*Ibid.* (citation omitted).

Here, Reliaguard decided to procure samples of Eco's products, construct an elaborate set piece incorporating two energized cutouts, craft a fake crow, film multiple videos, and upload those videos to the company YouTube channel. A jury could reasonably conclude that Reliaguard's comparative advertising efforts were deliberately false within the meaning of the Lanham Act and caused actual consumer deception and reliance. This is not a case where there the plaintiff has failed to present "any" evidence of injury. Our record shows that Reliaguard employees broadcast the videos to PG&E decisionmakers at a meeting and then repeatedly emailed PG&E decisionmakers — including PG&E's Senior Vice President — links to the videos. Shortly after the videos were shared, PG&E chose to substantially end its fifteen-year business relationship with Eco in part because of concerns with the loose fit of Eco's cutout covers. For example, Chang stated in an internal PG&E email that PG&E had chosen to stop purchasing Eco covers in part because "[t]he Eco covers just seem to have too much openings to offer much protection to birds and squirrels" (Cart Decl. Exh. 33). Hernandez similarly stated that one of his "concerns" with Eco's covers was their "fitment issues with polymer cutouts" (*ibid.*). This evidence is sufficient to establish a genuine dispute over whether the videos that Reliaguard thought were worth the significant effort of producing

12

had some impact on PG&E's decision or at least caused a "lessening of the goodwill associated with" Eco's products. *Southland*, 108 F.3d at 1139. A jury can decide how to weigh the foregoing evidence against any self-serving testimony offered by PG&E employees.

To be clear, Eco need not show that PG&E spurned its business solely because of the videos. Our court of appeals has made clear that "an inability to show actual damages does not alone preclude a recovery" under the Lanham Act. *Southland*, 108 F.3d at 1146 (internal quotation marks omitted). Thus, a false advertising claim under the Lanham Act can survive summary judgment "even without a showing of actual consumer confusion," and "the preferred approach allows the district court in its discretion to fashion relief, including monetary relief, based on the totality of the circumstances." *Ibid.* For the reasons stated above, Eco has presented a triable issue as to whether it suffered "some injury" because of Reliaguard's decision to show the videos to PG&E and therefore a triable issue as to whether it is entitled to appropriate monetary relief.

Reliaguard's motion for summary judgment on Eco's Lanham Act claim is accordingly **DENIED**.

### D. *MAYDWELL & HARTZELL'S INVOLVEMENT.*

Eco argues that M&H's conduct also violated the Lanham Act because M&H was "intimately involved in th[e] process" of providing the videos and the test report to PG&E (M&H Opp. 25). When asked to present evidence of M&H's intimate involvement at the motion hearing, Eco's counsel represented to the Court that Gavin Frase (the son) "held the camera" that shot the videos. When asked to provide evidence in the record supporting this critical assertion, Eco's counsel was unable to find any during the hearing. Counsel was given until the end of the day to submit the supposed proof. Eco eventually submitted a letter attaching a sequence of text messages. The letter stated they showed that Gavin Frase had shot the videos at a PG&E facility in April 2018 (Noll M&H Exh. 22). In a reply letter submitted the next day, M&H provided evidence showing that the text messages were sent by a Reliaguard employee, *not* Gavin Frase (Noll. Exh. 44). Moreover, the text messages plainly

13

had no connection to any videos involving Eco's products. The Court is disappointed that Eco's counsel would have misrepresented the record so badly.

The other snippets of evidence referenced by Eco are inconclusive and would not support a verdict against M&H. Further, Eco's arguments that M&H managed to hide essential evidence because Bob Frase "refused to be deposed" and Gavin Frase "failed to preserve his text messages" are not persuasive (M&H Opp. 20–21). Eco never raised these discovery issues before the instant motion and may not do so now at this late stage. That Eco never sought court intervention before now suggests that any prejudice it might have incurred for the Frases' alleged discovery misconduct is minimal. Eco has not identified any *specific* evidence that it believes did not get produced. Eco's claims cannot survive summary judgment based on speculative accusations about M&H's involvement. Thus, M&H's motion as to Eco's Lanham Act claim is **GRANTED**.

### 2. TRADE LIBEL.

"Trade libel is the publication of matter disparaging the quality of another's property, which the publisher should recognize is likely to cause pecuniary loss to the owner." *ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1010 (2001) (citing *Leonardini v. Shell Oil Co.*, 216 Cal. App. 3d 547, 572 (1989)). "Whereas defamation concerns injury to the reputation of a person or business, trade libel involves false disparagement of the quality of goods or services." *Mann v. Quality Old Time Serv., Inc.*, 139 Cal. App. 4th 328, 340 (2006).

To state a claim for trade libel — which the California Supreme Court has alternatively referred to as "product disparagement" — a plaintiff must show that defendants issued (1) a false or misleading statement that (2) specifically referred to the plaintiff's product or business, (3) clearly derogated that product or business, and (4) resulted in special damages. *Hartford Cas. Ins. Co. v. Swift Distribution, Inc.*, 59 Cal. 4th 277, 291 (2014). The plaintiff also must show that the statement was made with the knowledge of its falsity, or "in reckless disregard of its truth or falsity." *Id*. at 290.

For the reasons stated above with respect to Eco's Lanham Act claim, M&H's motion for summary judgment on Eco's trade libel claim is **GRANTED**.

14

For those same reasons, Eco has established a genuine dispute as to whether Reliaguard intentionally disparaged Eco's products. This order rejects Reliaguard's contention that Eco has not presented a triable issue on the knowledge requirement. As detailed above, our record shows that Reliaguard was familiar with Eco's products, spent years and significant resources developing a competing cutout cover, and engaged in a deliberate effort to create comparative videos. Reliaguard acknowledges, for example, that its own "early prototypes were focused on the porcelain cutouts that PG&E was using at the time" and it had to engage in "numerous redesigns" to adapt to PG&E's new polymer cutouts (Br. 9; Jacobsen Decl. ¶¶ 4–6). A reasonable jury could infer that Reliaguard knew that an ECC-10 cutout cover was not designed to fit over PG&E's polymer cutouts. Alternatively, a reasonable jury could infer that Reliaguard made its videos with reckless disregard as to whether Eco's product was installed properly. With respect to the modified test report, there is sufficient evidence to create a genuine dispute over whether Reliaguard selectively modified the test report to falsely imply that a third-party laboratory had determined that Eco's ECC-2 cover was not flame resistant.

Reliaguard's motion as to Eco's trade libel claim is **DENIED**.

3.   **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE.**

To establish a claim for intentional interference with prospective economic advantage, a plaintiff must show

> (1) the existence, between the plaintiff and some third party, of an economic relationship that contains the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm proximately caused by the defendant's action.

*Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.*, 2 Cal.5th 505, 512 (2017) (citation omitted). The predicate "wrongful act" must be "unlawful" such that it is "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003).

Here, Eco asserts that the communications described above serve as the predicate wrongful acts. As detailed above, Eco has failed to show that M&H substantially participated

15

in the conduct that Eco contends constituted false advertising and trade libel.  And, while Eco argues that M&H's "wining and dining" of PG&E employees was "improper," Eco has not identified any "constitutional, statutory, regulatory, common law, or other determinable legal standard" that this conduct would violate.  *See Korea Supply Co.*, 29 Cal. 4th at 1158–59.  M&H's motion for summary judgment on Eco's IIPEA claim is accordingly **GRANTED**.  This does not mean, however, that evidence of "wining and dining" will be excluded at trial.

By contrast, for the reasons stated above, Eco has presented a triable issue as to whether Reliaguard intentionally provided misleading or false statements to PG&E.  Reliaguard argues that Eco's IIPEA claim must fail regardless because Eco has not shown "the existence of any economic relationship between PG&E and Eco with respect to Eco's ECC-2 cutout cover" (Reply Br. 13).  Tellingly, Reliaguard cites no authority supporting this contention.  California law distinguishes between a tort claim alleging interference with a prospective business relationship, as Eco claims here, and a claim alleging interference with an existing contractual relationship.  *See Korea Supply Co.*, 29 Cal. 4th at 1157.  Eco does not assert that it had any enforceable contractual agreement with PG&E to sell its ECC-2 cutout covers.  Rather, Eco contends that it had an established business relationship of over fifteen years with PG&E with respect to the sale of cutout covers and that Reliaguard intentionally interfered with this relationship by providing PG&E false and misleading information.

A reasonable jury could infer, drawing all inferences in Eco's favor, that Eco and PG&E had a business relationship "contain[ing] the probability of future economic benefit." *Roy Allan*, 2 Cal.5th at 512.  Our record suggests that PG&E was closely considering both Eco's ECC-2 cover and Reliaguard's cover during the time period that Reliaguard provided the videos and altered test report to PG&E.  In a sequence of internal July 2018 emails, for example, Chang told Hernandez and Steffens that both Reliaguard's and Eco's covers "cost about the same, now it all comes down to the design and how easy to applying on the cutout" (Ex. 40).  In a follow-up email, Steffens told Hernandez that, based on his own testing, Eco "do produce a [flame-retardant] cover and it does perform the best out of what we have looked at" (*ibid.*).

16

Reliaguard's motion as to Eco's IIPEA claim is accordingly **DENIED**.

### 4.        FALSE ADVERTISING AND UNFAIR BUSINESS PRACTICES.

"Claims for false advertising and unfair competition under California law are 'substantially congruent' to claims made under the Lanham Act, and require the same proof." *RingCentral, Inc v. Nextiva, Inc.*, No. C 19-02626 NC, 2021 WL 2476879, at *3 (N.D. Cal. June 17, 2021) (Judge Nathanael M. Cousins); *see also Appliance Recycling Centers of America, Inc. v. JACO Environmental, Inc.*, 378 Fed. Appx. 652, 656 (9th Cir. 2010). However, "California's Unfair Competition Law (UCL) is equitable in nature; damages cannot be recovered." *Chowning v. Kohl's Dep't Stores, Inc.*, 733 F. App'x 404, 405 (9th Cir. 2018) (citation omitted). "Remedies are generally limited to injunctive relief and restitution." *Ibid*. In particular, "[l]ost profits are damages, not restitution, and are unavailable in a private action under the UCL." *Lee v. Luxottica Retail N. Am., Inc.*, 65 Cal. App. 5th 793, 797 (2021).

Eco has not presented any damages theory providing for restitutionary relief (*see, e.g.*, M&H Opp. 30). Eco argues, however, that it is entitled to injunctive relief, and specifically "seeks to have defendants cease and desist their publications of the defamatory and false information about Eco products" (*ibid*.). But the asserted communications took place several years ago. Because Eco has not identified any specific conduct appropriate for prospective injunctive relief, defendants' motions for summary judgment on Eco's UCL claims are **GRANTED**.

### CONCLUSION

For the reasons stated above, M&H's motion for summary judgment is **GRANTED**. To the extent stated above, Reliaguard's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. Eco's Lanham Act, trade libel, and IIPEA claims remain for trial, which is scheduled to begin on **NOVEMBER 28, 2022**. Please read the Court's standing order for jury trials.

**IT IS SO ORDERED.**

Dated: April 19, 2022

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE